### SYNTHETIC ORGANIC CHEMICAL MANUFACTURERS ASSOCIATION, et al.

v.

### SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.

#### Civ. A. No. 89–0884–LC.

United States District Court, W.D. Louisiana, Lake Charles Division.

Aug. 28, 1989.

---

Bernard H. McLaughlin, Jr., Stockwell, Sievert, Viccellio, Clements and Shaddock, Lake Charles, La., R. Bruce Dickson, Bruce D. Ryan, Lorie J. Schmidt–Praul, Paul, Hastings, Janofsky & Walker, Washington, D.C., for plaintiffs.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Joseph S. Cage, Jr., U.S. Atty., Thomas B. Thompson, Asst. U.S. Atty., Sheila Lieber and Wendy Kloner, Attys., Dept. of Justice, Civ. Div., Federal Programs Branch, Washington, D.C., for defendants.

Charles S. McCowan, Jr., Bradley C. Myers, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, La., David J. Hayes, Douglas B. Farquhar, Catherine J. LaCroix, Hogan & Hartson, David F. Zoll, Susan T. Conti, Chemical Mfrs Assn., Washington, D.C., for intervenors Chemical Mfrs. Assn.

Ulysses Gene Thibodeaux, Newman & Thibodeaux, Lake Charles, La., Jacqueline M. Warren, Donald S. Strait, Natural Resources Defense Council, New York City, for Natural Resources Defense Council.

Karen Florini, Environmental Defense Fund, Washington, D.C., for Environmental Defense Fund.

VERON, District Judge.

## RULING

This is an action for declaratory judgment and injunctive relief challenging (a) the action of the Department of Health and Human Services ("HHS") establishing procedures and criteria under which the Secretary of Health and Human Services ("Secretary") and the National Toxicology Program ("NTP"), pursuant to 42 U.S.C. § 241(b)(4), classify chemical substances as ones that are known, or that may reasonably be anticipated to be, carcinogens (hereinafter referred to as "Classification Procedures and Criteria") and (b) the application of these Classification Procedures and Criteria to plaintiffs' products (paradichlorobenzene (PDCB), methylene chloride, tetracholroethylene, ethyl acrylate, and chlorinated paraffin) to classify PDCB as a carcinogen.[1] The issues presently before the Court are plaintiff's motion for a preliminary injunction and defendant's motion to dismiss.

This action was originally brought by Synthetic Organic Chemical Manufacturers Association ("SOCMA"), Chlorobenzene Producers Association ("CPA"), PPG Industries, Inc., Lagasse Brothers, Inc. and Standard Chlorine Chemical Company. Plaintiff SOCMA is a non-profit trade association whose members manufacture chemical substances which are affected by the Classification Procedures and Criteria. Plaintiff CPA is an association of all United States producers of chlorobenzenes, including PDCB. The individual corporate plaintiffs manufacture and sell chemicals, including PDCB, a chemical widely used for the control of moths and odor and as an industrial intermediate.

The Chemical Manufacturers Association (CMA) was subsequently granted leave to intervene as a plaintiff. CMA is a non-profit trade association whose 171 member companies represent over 90% of the productive capacity of basic industrial chemicals in the United States.

The action was originally brought against the Secretary of HHS, the Undersecretary of HHS ("Undersecretary"), the Director of the National Toxicology Program of the National Institute of Health ("NIH") and HHS. The Secretary is the official responsible under 42 U.S.C. § 241(b)(4) for classifying chemical substances as known or reasonably anticipated to be carcinogens to which a significant

---

**1.** Plaintiff's original suit dealt only with PDCP. They subsequently added methylene chloride, tetrachloroethylene, ethyl acrylate and chlorinated paraffin which the government intends to include in the Fifth Annual Report and butylated hydroxyanisole and crystalline silica which the government proposes to include in the Sixth Annual Report. In the course of this opinion whenever reference is made to PDCP the reader should understand that it also includes methylene chloride, tetrachloroethylene, ethyl acrylate and chlorinated paraffin. Butylated hydroxyanisole and crystalline silica are discussed separately.

number of persons are exposed and for publishing his determinations in the Annual Report on Carcinogens ("Annual Report"), 42 U.S.C. § 241(b)(4). The Undersecretary is the official within HHS to whom the Secretary has delegated the responsibility for approving the procedures and criteria under which the Secretary takes the actions required of him by 42 U.S.C. § 241(b)(4). The Director of the National Toxicology Program is the official in HHS to whom the Secretary has delegated responsibility for classifying substances as carcinogens and for preparation of the Annual Report.

The Natural Resources Defense Council ("NRDC") and the Environmental Defense Fund ("EDF") were granted leave to intervene as defendants. NRDC and EDF are national, non-profit membership organizations dedicated to the protection of public health and the environment.

## JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1337 (Commerce); 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act), and 28 U.S.C. § 1651(a) (All Writs Act).

Venue lies in this district under 28 U.S.C. § 1391(e). Plaintiff, PPG Industries, Inc. has a chemical manufacturing facility in the district; Standard Chlorine Chemical Company and PPG Industries, Inc. manufacture paradichlorobenzene which is sold in this district. Plaintiff Lagasse Brothers, Inc. is a Louisiana corporation which sells PDCB in this district.

## FACTS

Plaintiffs filed a complaint for preliminary and permanent injunctive relief to enjoin defendants from listing PDCB in the proposed *Fifth Annual Report on Carcinogens* ("Fifth Report") without first "considering the relevant evidence excluded by reason" of the Secretary's criteria for classifying these substances. Plaintiffs contend the Secretary's criteria are arbitrary and capricious and not in accordance with the Public Health Service Act, 42 U.S.C. § 241(b)(4).

The Annual Reports, mandated by the 1978 Amendments to the Act, are prepared by the NTP under delegation from the Secretary. According to Section 262 of Public Law 95–622, amending section 301 of the Public Health Service Act, 42 U.S.C. § 241(b)(4)(A), the Secretary is to publish an Annual Report on Carcinogens which must contain a list of substances which "either are known to be carcinogens or may reasonably be anticipated to be carcinogens ... to which a significant number of persons residing in the United States are exposed...." 42 U.S.C. § 241(b)(4)(A).

The NTP is a federal health research program which was created in 1978 to, among other things, increase the number of environmental chemicals being tested for carcinogenicity and to disseminate the test results to the public, governmental agencies, and the medical and scientific communities. To date the Department has published four Annual Reports on Carcinogens and has prepared a proposed Fifth Annual Report.

In 1981, the Secretary developed classification criteria to determine which substances are ones that may reasonably be anticipated to be carcinogens, which include the substances for which:

A. There is limited evidence of carcinogenicity from studies in humans, which indicates that causal interpretation is credible, but that alternative explanations, such as chance, bias or confounding, could not adequately be excluded, or

B. There is sufficient evidence of carcinogenicity from studies in experimental animals which indicates that there is an increased incidence of malignant tumors: (a) in multiple species or strains, or (b) in different routes of administration or using different dose levels, or (c) to an unusual degree with regard to incidence, site or type of tumor, or age at onset. Additional evidence may be provided by data concerning dose response effects, as well as information on mutagenicity or chemical structure.

Under this criteria, positive results are required in multiple (at least two) animal

carcinogenicity bioassays in order for there to be sufficient evidence that a substance is one that may reasonably be anticipated to be a carcinogen. A bioassay on a chemical substance is a long-term carcinogenicity study in one sex of one specie of experimental animal. In addition, to be considered for inclusion in the Annual Report, the studies on carcinogenicity must be peer-reviewed, and potential exposure of a significant number of persons residing in the United States must also be demonstrated.

## ISSUES

Two issues are before this Court. Defendants have filed a motion to dismiss, alleging that plaintiffs lack both standing and the right to appeal the decision of the Secretary. Also at issue at this time is plaintiffs' motion for a preliminary injunction to preclude the Secretary from including the chemicals at issue in the Fifth Annual Report.

## A. MOTION TO DISMISS

Defendants have filed a motion to dismiss alleging several grounds, each of which will be discussed separately.

### 1. *Standing*

■ To have standing "a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief" *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Plaintiffs have satisfied these standing requirements. Plaintiff will suffer lost sales from the adverse publicity which would be caused by the inclusion in the Fifth Annual Report of the chemicals which plaintiffs produce. Both parties admit that the public relies upon the Annual Report as one of the few major sources of objective, peer-reviewed information on carcinogenic substances. A consumer reaction study offered by plaintiffs showed that a significant reduction in usage of mothballs and toilet deodorizers would result from the government's identification or labeling of such products as carcinogens. These lost sales are unlikely to be recovered if PDCB were removed from the Annual Report after being issued by the Secretary; customers are likely to move to competing products and not to return to mothball and toilet deodorizer products containing PDCB.

The Secretary's designation of a substance in the Annual Reports also has a substantial regulatory impact. For example, the Occupational Safety and Health Administration's Hazard Communication Standard requires manufacturers to label as a "carcinogen" every substance listed in the Annual Report. Various state regulatory requirements are also triggered by classification in the Annual Report. *See* Ala.Code § 22–33–4; Fla.Stat. § 442.103(2)(b); Ill.Ann.Stat. ch. 48, ¶ 1403; Mass.Gen.Laws ch. 111F, § 4(b) (1985); Penn.Stat.Ann. tit. 35, § 7301 *et seq.* (Purdon 1988). In addition, though PDCB currently is not subject to the OSHA Hazard Communication Standard labeling requirement, it would be subject to that requirement if listed in the Annual Report.[2]

### 2. *APA Review*

■ Both the Supreme Court and the Fifth Circuit have recognized "the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986); *see Deering Milliken, Inc. v. OSHA,* 630 F.2d 1094, 1099 (5th Cir.1980). The Administrative Procedure Act gives this Court broad authority to review "agency action," 5 U.S.C. § 702, which includes "the whole or a part of an agency rule, order, ... or the equivalent or denial thereof," 5 U.S.C. § 551(13).

---

2. The government asserts that any harm suffered by CMA's members is due to the independent actions of third parties and is not remediable in this action. Courts consistently have held that any traceable injury will provide a basis for standing, even where it occurs through the acts of a third party. *E.g., National Wildlife Federation v. Hodel,* 839 F.2d 694, 705 (D.C.Cir.1988) ("... mere indirectness of causation is no barrier to standing, ... an injury worked on one party by another through a third party intermediary may suffice.")

The Supreme Court has recognized that the term "agency action" is to be interpreted expansively, as it "brings together previously defined terms ... to assure the complete coverage of every form of agency power, proceeding, action or inaction." *Federal Trade Comm'n v. Standard Oil Co. of California,* 449 U.S. 232, 238, n. 7, 101 S.Ct. 488, 492, n. 7, 66 L.Ed.2d 416, n. 7 (1980) (quoting S.Rep. No. 752, 79th Cong., 2d Sess. 255 (1946)). The Secretary's adoption of the Classification Procedures and Criteria fits well within the rubric of reviewable "agency action." In *United States Dept. of Labor v. Kast Metals Corp.,* 744 F.2d 1145, 1151 (5th Cir.1984), the Fifth Circuit specifically recognized that "an agency act designed to implement law is by definition a rule" within the meaning of 5 U.S.C. § 551(4)—and hence subject to judicial review under 5 U.S.C. § 702. Congress intended the Secretary, through the Annual Report, to identify carcinogens and to assist regulatory agencies in setting priorities for action. As Congress explained, the Secretary must "evaluate the efficacy of existing regulatory standards" for each substance in the Report, so that "in the event that a substance has been identified as carcinogenic and is not currently regulated or is not adequately regulated," the Secretary would "bring this to the attention of the appropriate regulatory agency so that it may take prompt action." H.R.Rep. No. 1192 at 23. The Annual Report was intended to offer the Secretary's judgment as to carcinogenicity for reference by a broad range of regulatory agencies and to play an important role in setting the regulatory agenda. It fits squarely within the type of decision that Congress intended to be reviewable under the APA. Courts have recognized that the *substance* of an agency's activities is the controlling factor, regardless of the *label* that may be applied. *See Environmental Defense Fund, Inc. v. Gorsuch,* 713 F.2d 802, 816 (D.C.Cir.1983); *Chamber of Commerce of United States v. OSHA,* 636 F.2d 464, 468 (D.C.Cir.1980). Here, the Criteria are "designed to implement" the statutory requirement that the Secretary classify substances as known or reasonably antici-

pated to be carcinogens and limit the Secretary's discretion in making future classification decisions. The Criteria thus constitute a "rule" as defined in § 551(4), subject to judicial review pursuant to § 702.

■ A separate argument is that publishing the Annual Report does not constitute "agency action." We reject this view, as this court stated in *Dow Chemical, USA v. Consumer Product Safety Comm'n,* 459 F.Supp. 378, 386 (W.D.La.1978):

Agency action may be reviewable even though it is never to have any formal effect. In recent years federal courts have become sensitive to the need in particular controversies for judicial review of federal administrative action even though it imposes no direct obligation and has no enforcement effect. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66–69, 83 S.Ct. 631 [637–639], 9 L.Ed.2d 584 (1963); *Straus Communications, Inc. v. FCC,* 174 U.S.App.D.C. 149, 530 F.2d 1001 (1976); *Continental Air Lines, Inc. v. CAB,* 173 U.S.App.D.C. 1, 18, 522 F.2d 107, 124 (1974); *Citizens Communications Center v. FCC,* 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971). The argument that an order lacks finality because it has no independent effect on anyone has 'the hollow ring of another era. Agency orders that have no independent coercive effect are common.' *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970).

Therefore, the issuance of the Annual Report is agency action even though it is informational and imposes no sanctions or obligations. *Dow Chemical* provides another relevant example of the reviewability of this action:

[I]n *Air Line Pilots Ass'n Int. v. Department of Transportation,* 446 F.2d 236 (5th Cir.1971), the Fifth Circuit reviewed a determination by the Federal Aviation Administration that a proposed structure would prevent 'no hazard' to air navigation. The FAA argued unpersuasively that its 'hazard' or 'no hazard' determination had no enforceable effect

and the proponent of the structure could proceed in his construction with impunity since the only effect of the FAA's determination was its power of moral persuasion. The court noted that 'it takes little knowledge of the goings-on about us to be aware that 'moral suasion' is a considerably potent force in our society,' *Air Line Pilots*, 446 F.2d at 241, and that as a practical matter the FAA determination would undoubtedly have a substantial effect upon the ability of the proponent of the structure to secure financing or obtain insurance. In the event that the parties opposing the building sought to prevent construction through some type of common law action, the court found that the FAA no hazard letter would be almost fatal to this cause of action. The court, evidencing the new judicial pragmaticism in resolving ripeness issues, accordingly granted review of the FAA no hazard letter. *Dow Chemical*, 459 F.Supp. at 386–87.

■ The Court also rejects the government's contention that, even if agency action exists here, the listing of substances in the Annual Report is committed to agency discretion by law. This is a very narrow exception. The legislative history of the Administrative Procedure Act indicates that it is applicable in those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 820–21, 28 L.Ed.2d 136 (1971).

Here Congress imposed specific constraints on the Secretary's actions. Under the statute, the Secretary may include in the Annual Reports only substances that are "known to be carcinogens or may reasonably be anticipated to be carcinogens." 42 U.S.C. § 241(b)(4). The legislative history reflects a Congressional intent specifically to limit the Secretary's discretion by directing that "there must be reasonable ground for designating a substance as a putative carcinogen." Joint House–Senate Summary, 124 Cong.Rec. 38657 (Oct. 14, 1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 9042, 9063, 9080. This direction

to the Secretary to only include those substances "reasonably anticipated to be carcinogens" is a clear limitation on the Secretary's power. Because Congress mandated standards which the Secretary must follow, the Judiciary is authorized to review the Secretary's actions.

Therefore for the foregoing reasons, the defendant's motion to dismiss is DENIED.

## B. MOTION FOR INJUNCTIVE RELIEF

The second matter for the court is plaintiffs' motion for injunctive relief.

In order to obtain preliminary injunctive relief plaintiffs must show:

(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to defendant, and (4) that granting the preliminary injunction will not disserve the public interest. *Mississippi Power & Light v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985).

A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four ... prerequisites. The decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Miss. Power & Light*, 760 F.2d at 621.

A primary issue before the Court is whether the NTP's interpretation of 42 U.S.C. § 241(b)(4) is arbitrary and capricious. Plaintiffs' motion is based on the theory that the NTP refused to consider certain evidence and does not conduct complete hazard identification. Plaintiffs must prove that the NTP's interpretation is arbitrary and capricious, in order to succeed on the merits. In order to analyze this issue, the Court must first examine the procedure used by the NTP in developing the Annual Report and the application of these procedures to the chemicals at issue.

### 1. *Preparation Process for the Annual Reports*

The process for preparing the Annual Reports involves multiple levels of review,

both of the substances considered for inclusion in the Reports and of the draft Reports prior to publication. Continuing opportunities for public comment and participation are also an integral part of the process. Peer Review Panels, consisting of nongovernment (including industry) experts, review carcinogenicity studies on substances tested by NTP and provide their comments on NTP Technical Reports prepared on these substances.

Two scientific review committees review available data relevant to the carcinogenicity of the substances (*i.e.*, NTP Technical Reports, Interactional Agency for Research on Cancer ("IARC") Monographs, and other peer-reviewed carcinogenesis studies) and to exposure to the substances of persons in the United States. One committee is the National Institute of Environmental Health Sciences ("NIEHS") Scientific Review Committee, consisting of intramural scientists with expertise in the disciplines relevant to the evaluation of chemical carcinogenesis. The second group is the Working Group for the Annual Reports on Carcinogens, which is a Subcommittee of the NTP Executive Committee. Scientists from the following agencies are members of the Working Group: CPSC, EPA, FDA, National Cancer Institute, NIEHS, National Institute for Occupational Safety and Health, National Library of Medicine, OSHA, and NTP.

After this evaluation of candidate substances by both of these groups, a list of substances is proposed for addition to the next Annual Report. The list is subdivided into two sections: those substances "known to be carcinogens" and those substances "reasonably anticipated to be carcinogens." The list of substances, with key references to carcinogenicity date, is then published in the *Federal Register* for comment. Final decisions on the substances to be included in the Annual Report and on other issues raised are made after the two review groups have evaluated the public comments on these issues.

The results of the deliberations of the two scientific review committees are submitted to the NTP Executive Committee, which consists of the heads of CPSC, EPA, FDA, NIC, NIEHS, NIOSH, NIH, ATSDR, and OSHA. The proposed Annual Report is then submitted to the Assistant Secretary and, finally, the Secretary. The review process regarding the substances at issue is as follows:

*Paradichlorobenzene*

Paradichlorobenzene was selected by the NTP for oral carcinogenicity studies in male and female mice and rats because it is widely produced, it is present in water supplies, there is a possible link between it and leukemia in humans, and there is significant human exposure to the substance. The NTP administered PDCB to rats and mice by oral gavage at two dose levels for two years. Control groups were also maintained for two years. The studies (contained in the Technical Report on PDCB) were peer-reviewed at a public meeting on March 26, 1986, by the NTP Peer Review Panel. Four of the thirteen scientists on that Peer Review Panel worked for the chemical industry, two worked for a private toxicology testing and research organization supported solely by funds from the chemical industry, four were on the faculties of academic institutions, one was an employee of a State health agency, one worked for a labor union, and one was employed by a consulting firm. Twelve of the members were present at the March 26, 1986, meeting.

The Peer Review Panel concluded by a vote of 10–1 that there was clear evidence for carcinogenicity of PDCB in male rats (kidney tumors) and in male and female mice (liver tumors in both sexes), and that there was no evidence for carcinogenicity of PDCB in female rats. (The Chairman did not vote in accordance with the by-laws of the Peer Review Panel.)

The Chlorobenzene Producers Association (CPA), one of the plaintiffs in this case, submitted to NTP industry-sponsored inhalation studies for PDCB in which no evidence of cancer was found in rats, and commented on these studies at the March 26, 1986 meeting. However, because the NTP Technical Report on the PDCB carcin-

ogenicity studies found limitations in the inhalation data, the Peer Review committee did not consider them as discounting the positive evidence on PDCB.[3]

The NTP Technical Report on PDCB was next submitted to the two scientific review committees that evaluate substances for inclusion in the Annual Reports—the NIEHS Scientific Review Committee and the NTP Working Group.

Plaintiffs again submitted their mechanisms data on PDCB to NTP, which was distributed to the two scientific review committees who already had the NTP Technical Report and the Peer Review Panel's assessment of plaintiffs' data.

Minutes of the meeting of the Working Group reveal that its members considered plaintiffs' data:

> The Working Group considered each of the points raised by the commenter; several members noted that evaluation of data on possible mechanisms of action is more appropriate to assessments of the degree of risk to humans which is beyond the purview of these Reports.

3. As noted in the NTP Technical Report on PDC, in the industry sponsored negative inhalation studies, the mice studies were terminated very early because of high mortality among the male mice. Thus, these studies do not qualify as an adequate evaluation of PDCB's carcinogenicity in mice. In the rat studies, the animals were exposed to PDCB for 76 weeks and then maintained another 32 weeks before being sacrificed. No treatment-related carcinogenic effects were observed in either sex. However, the two doses appear to have been too low for adequate carcinogenicity studies because no signs of stress to the animals such as reduced body weight gains were seen at either dose level. If no such signs are observed, it cannot be assumed that sufficiently high doses were administered. Also, the 76–week exposure duration, as opposed to 104–week duration, is considered by experts in carcinogenesis to be too short based upon contemporary standards for carcinogenicity studies.

In its 1987 evaluation of the carcinogenicity data on PDCB, IARC reviewed the NTP oral carcinogenicity studies and the industry-sponsored inhalation studies. IARC concluded that although no increase in the incidence of tumors was noted in the industry studies, "the duration of exposure was limited." Based upon the findings in the NTP studies, IARC concluded that there was sufficient evidence of carcinogenicity in experimental animals and classified it as "possibly carcinogenic to humans."

Based upon the findings of carcinogenicity of PDCB in two species and in both sexes of one of those species, the two scientific review committees concluded that there was sufficient evidence of carcinogenicity of PDBC in laboratory animals and that PDCB satisfied the scientific criteria for designation as a substance "reasonably anticipated to be a carcinogen" in the Annual Reports. Because these committees also concluded that a significant number of persons residing in the United States were exposed to the chemical from its occurrence in water supplies and the air, the NTP selected the chemical for inclusion in the proposed Fifth Report.[4]

### Methylene Chloride

Methylene Chloride was selected for inclusion in the proposed Fifth Report as a substance that may reasonably be anticipated to be a carcinogen based upon the positive findings of tumors in male and female rats and male and female mice in NTP inhalation carcinogenicity studies, and because a significant number of persons are exposed to it.[5]

4. In 1987, EPA announced its classification and regulation of PDCB as a possible human carcinogen in drinking water. 52 Fed.Reg. 25690 (July 8, 1987). The Occupational Safety and Health Administration ("OSHA") Hazard Communication Standard ("Standard") requires employers covered by this Standard to provide its employees with Material Safety Data Sheets ("MSDS") on PDCB as an IARC possible (group 2B) carcinogen. IARC classified PDCB as such in 1987. In January 1989, California classified and is regulating PDCB as a known carcinogen. Massachusetts has classified and is regulating PDCB as a probable carcinogen.

5. FDA has banned methylene chloride from cosmetics due to its carcinogenicity. 54 Fed.Reg. 27328 (June 29, 1989). Prior to its announced ban, FDA had reviewed industry's pharmacokinetic and mechanisms of action (metabolism) data but concluded that industry's evidence

> does not support the claim that the lung tumors arise from cytotoxic effects on the Clara cells, or that the Clara cells are necessarily the cell of origin of the lung tumors. 54 Fed.Reg. at 27333.

FDA also concluded that:

> [t]he available evidence is insufficient to explain how lung or liver tumors were caused in the mouse by the postulated mechanism and to rule out that inhaled methylene chloride

The two scientific review committees that evaluate candidate substances for possible inclusion in the Annual Reports considered the mechanism data on methylene chloride submitted by the industry. It was concluded that mechanism data was relevant to risk assessment, which is beyond the purview of the Annual Reports.

### Tetrachloroethylene

Tetrachloroethylene was evaluated for carcinogenicity by the NTP in two-year inhalation studies in male and female rats and mice. In these studies, NTP determined that tetrachloroethylene caused mononuclear cell leukemias and uncommon renal tubular cell leukemia in female rats. Tetrachloroethylene caused liver cancers in both male and female mice. Evidence of carcinogenicity was observed in all four of the NTP inhalation experiments. It was selected for inclusion in the Fifth Report by defendants based on this evidence and because a significant number of persons in the United States are exposed to it.

The two scientific review committees in the Annual Reports candidate substances for possible inclusion in the Annual Reports considered the mechanism data submitted by industrial commenters but concluded this data was relevant to risk assessment, which they claimed was beyond the purview of the Annual Reports.[6]

### Ethyl Acrylate

Ethyl acrylate was evaluated for carcinogenicity by the NTP in two-year carcinogenicity studies using oral intubation to administer the compound to male and female rats and mice. Under the conditions of these studies, NTP determined that ethyl acrylate was carcinogenic for the forestomach of both sexes of rats and mice. Ethyl acrylate was carcinogenic in all four of these experiments. It was selected for inclusion in the Fifth Report by defendants based on sufficient evidence of carcinogenicity and because a significant number of persons are exposed to it.

The two scientific review committees that evaluate candidate substances for possible inclusion in the Annual Reports considered the data submitted by industrial commenters on ethyl acrylate but concluded that this data was relevant to risk assessment, which they claimed was beyond the purview of the Annual Reports.[7]

### Chlorinated Paraffin

NTP included chlorinated paraffin in the proposed Fifth Annual Report based on positive evidence of carcinogenicity in multiple rodent studies and its exposure to a significant number of persons.[8]

The record does not demonstrate that plaintiffs submitted mechanism of action or pharmacokinetics data to the Secretary concerning chlorinated paraffin.

### 2. Arbitrariness of Defendants' Action

■ Plaintiffs have not demonstrated a substantial likelihood that they will prevail on the merits. They have failed to convince this Court that defendants' classification criteria are arbitrary, capricious, or in conflict with the Act.

directly causes lung tumors in mice, and that it may have the same effect in humans. *Id.* at 27340.

Upon completing its hazard identification process on methylene chloride, FDA decided that the carcinogenicity data in animals were sufficient to proceed further with its risk assessment and regulatory processes for this chemical.

The Consumer Product Safety Commission ("CPSC") issued a labeling requirement for certain consumer products containing methylene chloride because it "may pose a carcinogenic risk to humans." 52 Fed.Reg. 34698, 34699 (Sept. 14, 1987). California has classified methylene chloride as a known carcinogen.

6. California has classified and is regulating this chemical as a known carcinogen. In 1987,

IARC classified tetrachloroethylene as a possible human carcinogen. This chemical is subject to the OSHA Standard's MSDA regulation as an IARC possible carcinogen. EPA has proposed to regulate this chemical in drinking water as a probable human carcinogen. 54 Fed.Reg. 22062, 22091 (May 22, 1989).

7. IARC concluded in 1986 that this chemical is a possible human carcinogen. Ethyl acrylate is subject to the OSHA Standard's MSDS regulation

8. Chlorinated paraffin are subject to the OSHA Standard's MSDS regulations.

Plaintiffs ask this Court to find that the Secretary's determination of what is "relevant" or "sufficient" evidence for classifying a substance as a potential human carcinogen is illegal and to impose plaintiffs' definition of "relevant" or "sufficient" evidence on the Secretary's actions.

Under the APA, 5 U.S.C. § 706, the agency's action is entitled to a presumption of regularity. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S., at 415, 91 S.Ct., at 823.

The agency's interpretation of a statute is entitled to "great deference." *Udall v. Tallman*, 380 U.S. 1, 16 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), especially where scientific expertise is involved. *Baltimore Gas and Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir.1983). *Coca–Cola Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 608 F.2d 213, 222 (5th Cir.1979) (" '[E]ven when the issue is one of pure law, such as interpretation of ... regulations and statutes, room still is present for deference to the views of administrative agencies, particularly where the understanding of the problem is enhanced by the agency's expert understanding of the industry' "), *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C.Cir.) (*en banc*) *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). ("We must look at the [agency] decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.")

■ "A court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted). Even if the Court were to find plaintiffs' interpretation of the Act reasonable, the Court need not find that the Secretary's interpretation is the only possible

or only reasonable interpretation of the statute to uphold his interpretation. *Chevron*, 467 U.S., at 843 n. 11, 104 S.Ct., at 2782 n. 11.

■ In determining whether the agency's decision is arbitrary and capricious, the court does not weigh the scientific evidence or inquire into the wisdom of agency determinations based on that evidence. *Aberdeen & Rockfish R.R. Co. v. United States*, 682 F.2d 1092, 1096 (5th Cir.1982), *vacated and remanded on other grounds*, 467 U.S. 1237, 104 S.Ct. 3503, 82 L.Ed.2d 814 (1984); *Ethyl Corp. v. EPA*, 541 F.2d, at 37–38.

The Act itself does not define or indicate the type of classification criteria that the Secretary should adopt or the scope of evidence that he must analyze in classifying potential human carcinogens. Nor does the Act define what Congress meant by substances that "may reasonably be anticipated to be carcinogens." The Act merely provides, in pertinent part, that

[t]he Secretary shall publish an annual report which contains—

(A) *a list of all substances (i) which* either are known to be carcinogens or *may reasonably be anticipated to be carcinogens* and (ii) to which a significant number of persons residing in the United States are exposed.

42 U.S.C. § 241(b)(4).

NTP identifies its duties in preparing the Annual Report as performing the first step in hazard identification. This involves an analysis of epidemiology and carcinogenicity studies to determine the threshold question of whether a substance is known or may reasonably be anticipated to be a human carcinogen.

"Complete" hazard identification includes not only this first step but also a second step in hazard identification. Once the first step threshold question has been answered and a substance has been determined to be a potential human carcinogen, the second step in hazard identification begins: an analysis of data that is pertinent to risk assessment—assessing the *level* of the substance's carcinogenic risk to hu-

mans, *i.e.*, data that indicates an increased or decreased risk.

Completing the hazard identification process requires the use of the "weight of the evidence" approach, in which all data that is pertinent to performing this assessment of risk is analyzed. Use of the "weight of the evidence" approach by the federal regulatory agencies takes months, and sometimes years. In addition to the scientists within the responsible agency who analyze the data, contractors are often employed to retrieve all published data and prepare a monograph on the substance. Some agencies also use external experts to review the data and provide guidance to the agencies. The process is lengthy and costly, both in terms of time expended by agency personnel and money expended on contractors and outside consultants.

Scientists from the four federal regulatory agencies on the NTP Working Group for the Annual Reports have indicated to the Director of NTP that they would consider usage of the "weight of the evidence" approach for preparing the Annual Reports an infringement upon the regulatory responsibilities of their agencies.

In December 1987, after meetings with representatives of chemical trade organizations who expressed concerns about the proposed Fifth Report, the Undersecretary, directed the Executive Committee of the Committee to Coordinate Environmental and Related Programs (CCERP), to perform a review of the listing criteria and the report preparation process for the *Fifth Annual Report on Carcinogens.* An Ad Hoc Subcommittee was appointed to review the Report. After reviewing the statute mandating the Annual Reports on carcino-

gens and the legislative history, and evaluating input from the federal health regulatory agencies, the National Toxicology Program, and all parties that made presentations at the Subcommittee's open meeting and/or submitted written comments, the Subcommittee unanimously concluded that:

the Annual Reports on Carcinogens are informational documents that serve as meaningful compilations of data on the substances selected for inclusion. They represent the first step in hazard identification; they are not risk assessment documents.

In addition, the Subcommittee stated that the classification criteria were:

conservative and appropriate to the purpose of the Annual Reports as informational documents which serve as the first step in hazard identification. The science with respect to pharmacokinetics and mechanisms of action at the present time is not sufficiently advanced to use generically. Such data, however, are utilized by the regulatory agencies in the assessment of the potential risk from such substances, an undertaking beyond the scope of the Annual Reports.[9]

In his declaration submitted to the Court Richard Adamson, Ph.D., Chairman of the Ad Hoc Subcommittee stated:

It has always been the purpose of the Annual Reports on Carcinogens to perform the first step in hazard identification, to identify substances with sufficient evidence of carcinogenicity in humans ('known carcinogens') and to identify substances with sufficient evidence of carcinogenicity in animals ('reasonably anticipated to be carcinogens'). It was

---

9. Richard H. Adamson, Ph.D. director, Division of Cancer Etiology, National Cancer Institute of the National Institute of Health was chairman of the Subcommittee. The other four members were Dr. Barry L. Johnson, Associate Administrator, Agency for Toxic Substances and Disease Registry (ATSDR); Dr. J. Donald Millar, Director, National Institute for Occupational Safety and Health (NIOSH); Mr. Richard J. Riseberg, Chief Counsel, U.S. Public Health Service; and Dr. Richard Scheuplein, Acting Director, Office of Toxicological Sciences, Center for Food Safety and Applied Nutrition, Food and Drug Administration (FDA). The Subcommittee

met three times and also held an open meeting to solicit input on the issues from industry, labor, environmental groups, academic medicine, State governments, and other interested parties. The Subcommittee submitted its report on this review to CCEHRP in November 1988. The report contained the Subcommittee's recommendations on each of the issues relevant to the scope of the review. The CCEHRP Council and Board unanimously approved the report as written in December 1988. The Undersecretary accepted the report without changes on January 18, 1989.

the intent of Congress, and it has been well recognized and understood by the scientific community, that the purpose of the Annual Reports is to provide this first step of hazard identification. This function of the Annual Reports is not a new concept. It was not created by the CCEHRP Ad Hoc Subcommittee.

Nothing in the 1978 Amendments to the Act or its legislative history expressly or implicitly suggests that the Secretary should conduct "complete hazard identification," risk assessment, or the "weight of the evidence" approach in preparing the Annual Reports. Further, nothing in these Amendments or the legislative history suggests that in determining which substances "may reasonably be anticipated to be carcinogens" for listing in the Annual Reports, the Secretary should analyze pharmacokinetics or mechanisms of action data.[10]

Plaintiffs' contend that the NTP, by defining its role so narrowly, excludes evidence important to determining whether a substance is reasonably anticipated to be a carcinogen. Plaintiffs' criticize the NTP's reliance on animal testing and the refusal to use pharmacokinetic and mechanisms evidence.

The Court accepts the validity of the reliance on animal testing. There is broad consensus in the scientific community that animal evidence can and should be used to predict human carcinogenicity. The International Agency for Research on Cancer has stated that "[i]n the absence of adequate data on humans, it is biologically plausible and prudent to regard agents for which there is 'sufficient evidence' of carcinogenicity in animals as if they presented a carcinogenic risk of humans."[11] In addition, it is widely accepted that chemicals found to have no evidence of carcinogenicity in adequate studies in experimental animals present little to no carcinogenic hazard to humans.[12]

There is broad agreement in the scientific community with IARC's recommendation in this regard. Two lines of evidence support this presumption. First, all chemicals known to cause cancer in humans which have been studied under adequate test conditions have been shown to cause cancer in laboratory animals. Second, for a number of compounds where both human and animal data are available, there is good agreement between risks observed in humans and risks calculated from high-dose animal experiments.

Plaintiffs quote from the legislative history Congress' intent that HHS was "to

10. The legislative history to the 1978 Amendments to the Act reveal that the Annual Report was created as part of NIH's existing program for the identification of carcinogens through animal testing:

The acquisition of data in the identification of carcinogenic substances is, after all, the first step in the prevention of cancer due to environmental, occupational, and dietary sources. H.R.Rep. No. 1192, 95th Cong., 2d Sess. at 24. The House Committee report goes on to state at 28:

In keeping with the above directives under the cancer control programs the committee believes that the relevant data regarding carcinogenic agents and populations exposed to such agents should be consolidated in the form of an annual report. Therefore, the committee included a requirement under the national cancer program for the Director of the National Cancer Institute to publish such a report.

A House amendment to the bill transferred responsibility for the Annual Reports from the National Cancer Institute (a part of NIH) to the

Secretary. 1978 U.S.Code Cong. & Admin. News 9072, 9080.

11. The extent to which findings of carcinogenicity in experimental animals predict human carcinogenicity may never be fully validated due to the problems in performing adequate studies in humans, e.g., the ethical considerations of using humans as experimental subjects and the protracted length of time it takes to gather epidemiological data. However, the evidence to date strongly supports the extrapolation of animal carcinogenicity data to humans.

12. In endorsing NIH's animal bioassay program, Congress was well aware that "[b]ecause the carcinogenicity of the chemicals in man correlates with their carcinogenicity in animals, *it is reasonable to identify presumptive human carcinogens through animal experiments.*" Biomedical Research and Research Training Amendments of 1978: Hearings before the Subcommittee on Health and The Environment of the Committee on the Interstate and Foreign Commerce, House of Representatives, 95th Cong., 2d Sess. at 58–59 (emphasis added).

bear the primary responsibility for evaluating the total body of available data regarding *carcinogenesis.*" Plaintiffs misuse this quote to suggest that Congress intended the Secretary to analyze pharmacokinetics and mechanisms of action data in preparing the Annual Report. However, these are not *carcinogenesis* data. Pharmacokinetics studies are performed to learn how a living organism (*e.g.,* experimental animal) handles a foreign substance like cancer, *i.e.,* the rate of uptake, distribution and excretion of the substance, and the metabolites formed in the organism following exposure. Mechanisms of action studies are performed in an effort to ascertain the mechanism (at a cellular and subcellular level) by which a chemical produces a toxic effect like cancer. In other words, once a toxic effect is present, mechanisms studies attempt to determine how it became present.

Pharmacokinetics and mechanisms of action data are not relevant to determining the first step, threshold question of whether a substance is a potential human carcinogen.

Pharmacokinetics and mechanisms of action data are relevant to the second step in hazard identification, *i.e.,* to assessing the level of the substance's cancer risk to humans. Once a substance has been determined to be a potential human carcinogen, pharmacokinetics and mechanisms of action data then become relevant to estimating the level or extent of that substance's cancer risk in humans, for purposes of determining what regulation, if any, is appropriate.

The Secretary's determination that pharmacokinetics and mechanisms of action data are not relevant to the function of the Annual Report, which is the provision of information pertinent to the first step of hazard identification, is both reasonable and consistent with the Act. The purpose of the Annual Reports is to provide the public and regulators with an alert that a particular substance is a known or potential human carcinogen and to stimulate further evaluation by researchers and regulators.

The analysis of pharmacokinetics and mechanisms of action data is beyond the purview of the Annual Reports. It is the function of the regulatory agencies to consider this data in the context of complete hazard identification and risk assessment for the purpose of determining what, if any, regulation is appropriate.

Plaintiffs have not demonstrated a substantial likelihood that they will prevail on the merits of their claim that defendants' classification criteria are arbitrary, capricious, or an abuse of discretion in violation of the APA. This Court finds that it must withstand pressure to interfere with the Secretary's action, given this high standard of deference.

The Annual Report classification criteria are an appropriate exercise of defendants' responsibilities under the statute, and are consistent with current scientific knowledge concerning the first step of hazard identification. Defendants' determination that evidence of pharmacokinetic and mechanistic effects are not relevant to the listing process was an appropriate exercise of scientific judgment.

Plaintiffs have also sought to enjoin the listing of butylated hydroxyanisole and crystalline silica in the Sixth Annual Report. Even though the substances may have been proposed or are being preliminarily considered, there has been no showing that the NTP has made a final decision on these substances for future annual reports. Therefore any judicial decision regarding these two substances would be premature.

Certainly this court hesitates to take action which might unnecessarily alarm the general public. This reluctance is balanced by the court's desire to protect consumers from cancer-causing substances. Today's decision is based on the deference required by law to agencies making these difficult scientific judgments. Were the agency arbitrary in its disregard of Congressional instruction, the court would willingly act. But the court cannot find evidence that defendants' testing procedure is outside the scope of its legislative directive. This court has no justification for enjoining the

publication of the Fifth Annual Report. The plaintiff's motion is DENIED.

Because the actions of defendants in preparing the *Fifth Annual Report on Carcinogens* were "sufficiently rational ... to preclude a court from substituting its judgment" for that of the agency, *Chemical Mfrs. Ass'n. v. NRDC*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985), plaintiffs' motion for injunctive relief is DENIED.

THUS DONE AND SIGNED.