**COLD SPRING GRANITE COMPANY,**
Petitioner,

v.

**FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMIS-
SION, et al., Respondents.**

No. 95–1186.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 4, 1996.

Decided Nov. 1, 1996.

Warren M. Davison, Washington, DC, argued the cause for petitioner. With him on the briefs were Earl M. Jones, III and Steven R. McCown, Dallas, TX.

Jerald S. Feingold, Attorney, U.S. Department of Labor, Arlington, VA, argued the cause for respondents. With him on the brief was Walter C. Schumann Washington, DC, of counsel. Norman M. Gleichman, Takoma Park, MD, entered an appearance.

Before: EDWARDS, Chief Judge, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion of the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The Secretary of Labor, through the Mine Safety and Health Administration, filed a proposed civil penalty assessment against Cold Spring Granite Company for violating a mine safety regulation. After an evidentiary hearing, an administrative law judge ruled in the Secretary's favor and imposed a $157 penalty. The ALJ's decision became the final decision of the Federal Mine Safety and Health Review Commission and is the subject of the company's petition for judicial review.

## I

Cold Spring mines granite at its quarries in northern New York State. Huge chunks of the stone, weighing 700,000 pounds or more, are blasted from the quarry walls, split into rough rectangular or cubical pieces and then moved to Cold Spring's nearby finishing yard, where the pieces are squared off.

In late winter 1993, Joseph C. Cayea, a rock driller, began trimming operations in the Cold Spring finishing yard. Along the top edges of five-foot high, 25 ton granite blocks were straight lines of predrilled holes, rather like perforations along the margins of a piece of paper. Cayea's job was to drive wedges into the holes from the top of the block, separating the smaller slabs—or "grout" or "roughback"—from the larger pieces. After Cayea had completed the splitting operation on Block A, the grout—measuring 28" wide at the bottom and 16.5" wide at the top, and weighing nearly 10 tons— remained upright instead of falling to the ground. Cayea then climbed onto an adjacent piece of predrilled stone, Block B, and split it with his wedges. The resulting top-heavy grout, measuring 34" wide at the bottom and 51" at the top, also stayed in an upright position. In the meantime, a forklift removed the finished Block A, leaving behind the still-upright grout. As Cayea began splitting a nearby third block, Block C, he realized that he needed additional wedges. He jumped down from Block C, and retrieved his wedges, which were lying in front of the grout from Block A. At that moment, the grout from Block B, toppled over, crashing onto the grout from Block A, which in turn fell on Cayea. Cayea suffered severe injuries, requiring the amputation of both of his legs.

Several days after the accident, Mine Safety and Health Administration Inspector Edward M. Blow investigated the site. Blow thought the two pieces of grout might not have initially fallen over when Cayea split them from Blocks A and B because a layer of frost caused them to adhere to the ground, although "only God knows what really did happen." Blocks A and C had been resting directly on the ground when Cayea worked on them. The ground on which Block B rested was uneven and so, to level the stone, a small piece of wood, 6" × 6" × 10", had been placed at one end, directly under the slab Cayea later cut away.

Blow issued a citation for violation of 30 C.F.R. § 56.16001 ("Supplies shall not be stacked or stored in a manner which creates tripping or fall-of-material hazards."). An administrative law judge granted the Labor Solicitor's motion to amend the standard allegedly violated to 30 C.F.R. § 56.3400, which reads:

> Prior to secondary breakage operations, material to be broken, other than hanging material, shall be positioned or blocked to prevent movement which would endanger persons in the work area. Secondary breakage shall be performed from a location which would not expose persons to danger.

After an evidentiary hearing, the ALJ held Cold Spring liable for violating the first sentence of § 56.3400 by failing to "block" the grout from Block B—failing, that is, to position wood underneath in order to prevent this slab from falling over as it did. On the Commission's refusal to grant Cold Spring's petition for review, the ALJ's decision became the Commission's final decision. See 30 U.S.C. § 823(d)(1) & (d)(2)(A)(i).

## II

The first of Cold Spring's four arguments is that § 56.3400 did not apply to its operations in the finishing yard. No "secondary breakage operations"—a phrase undefined in § 56.3400—could have occurred there, the company says, because the granite had already been broken at least twice in the quarry. This presumes that a "secondary" operation denotes only the second step of a process rather than, as the Secretary believes, subordinate steps occurring after the primary one. There is nothing to commend Cold Spring's reading over the Secretary's. The standard embodied in § 56.3400 deals with safety. Why the safety measures contained in the regulation ought to be deployed only when the granite is broken for the second time is not apparent. The Secretary's plausible and sensible reading of his own regulation would prevail even if the company had presented an equally plausible alternative construction, which it has not. *S.G. Loewendick & Sons, Inc. v. Reich,* 70 F.3d 1291, 1294 (D.C.Cir.1995); *see also Energy West Mining Co. v. FMSHRC,* 40 F.3d 457, 462 (D.C.Cir.1994).

Cold Spring's next point focuses on the "[p]rior to secondary breakage" language of § 56.3400. According to the company, the words "prior to" specify only what must transpire before splitting operations commence. In other words, if the granite was not in danger of moving before Cayea began breaking off a slab, Cold Spring was in compliance. The argument is misconceived. Suppose a law required an automobile driver to fasten his seat belt "prior to" putting his vehicle in motion. Only a fool would think he could undo his seat belt as soon as his car started moving. "Prior to" in this context, and in the context of § 56.3400, includes "during." Otherwise the law is nonsensical.

Cold Spring's third point is that Cayea's injury did not occur during secondary breakage operations, as the Secretary maintains. The company reads the regulation to mean that after an employee splits one stone, the requirements of § 56.3400 are suspended until the employee begins splitting the next stone. It is hard to see the sense in this. The regulation is concerned with preventing danger to "persons in the work area." Cayea was such a person, when he was on top of a stone pounding his wedges and when he was gathering his wedges on the ground. The Secretary interprets the regulation to encompass not only the actual splitting of the granite but also the preparations needed to accomplish that task. This reading fits comfortably within the terms of § 56.3400 and is compatible with its purpose. Cold Spring's construction, while linguistically possible, is implausible. Cayea was therefore engaged in secondary breakage operations when, as he was retrieving his wedges, the slab of granite fell on him.

Cold Spring's fourth and final point is telling. Before us, and in the administrative proceedings, the company maintained that when a rock driller splits off a slab, the slab is supposed to fall over, that the large blocks of granite are positioned so that this occurs, that this is the customary practice in the industry, that it is a safe way of conducting finishing operations, and that it would in fact be unsafe if the company tried to prevent these heavy, irregularly-shaped waste pieces of granite from toppling. Inspector Blow, in his June 1993 report, wrote:

> I now understand more of how it [the accident] actually occurred. During the splitting process the rough back is really encouraged to tip over for easier handling by the forklift. In this case, two (2) seperate [sic] rough backs failed to tip over. No problem except the victim for some unknown reason placed himself in the path the blocks tipped. A rake or poker could have been used to recover the wedges.

MSHA Form 7000–12 (June 14, 1993). When he testified in the hearing, Blow agreed that after splitting the grout, it normally falls over and that this "is what you want to have happen." Blow also said that Cayea had actually tried to tip over the grout by pushing or prying it with a wedge. Blow suggested that rather than using a wedge, Cayea should have used a large crow bar.

We agree with the company's point, made succinctly in its Petition for Discretionary Review filed with the Commission:

The substantial evidence shows that the Company blocks the piece of granite so that the "rough back," when split, will separate away from the finished block of granite.... In other words, the process is designed so that the natural weight of the rough back will fall away after being split. Petition for Discretionary Review at 5 (filed Feb. 17, 1995). In holding that grout must somehow be prevented from falling, the ALJ enhanced not safety but danger: "This would require a worker to remove the blocking once the splitting process was completed, thereby putting the worker directly in the path of the rough back of every stone split." *Id.* at 5 n. 3. Rather than falling harmlessly to the ground, these multi-ton slabs of granite would perch precariously on timbers as the rock driller went about his business, moving from one unfinished piece of granite to another.

The Labor Secretary was hard put to defend the ALJ's decision. "Normally," the Secretary agreed, "the grout falls over onto its side into a stable position when it is split from the block." Brief for the Secretary of Labor at 5. If it falls immediately, there would be no violation of § 56.3400, according to what the Secretary told us at oral argument. One would think, then, that everything should be done to ensure that the grout does what it is supposed to do—fall. The ALJ's decision commands the opposite. And it may command the impossible, given the geometrically uneven shapes of these slabs. In terms of § 56.3400, it is not the grout's "movement which would endanger persons in the work area," but its lack of movement upon splitting. Perhaps Cayea should have called for assistance to push the slabs over; perhaps the company should have been alert to the problem on its own. Those are not questions before us. As to the only question we may answer, we hold that the ALJ erred in ruling that Cold Spring violated § 56.3400 by failing to block the grout from Block B to prevent it from moving.

The petition for review is granted and the Commission's order is vacated.