**CONSOLIDATION COAL COMPANY,**
**Petitioner,**

**v.**

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION and the Secretary of Labor, Respondents.**

No. 97–1100.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 14, 1998.

Decided Feb. 27, 1998.

Elizabeth S. Chamberlin, Pittsburgh, PA, argued the cause and filed the briefs for petitioner.

Yoora Kim, Attorney, U.S. Department of Labor, Washington, DC, argued the cause for respondents, with whom W. Christian Schumann, Counsel, was on the brief. Norman M. Gleichman, General Counsel, Mine Safety and Health Review Commission, entered an appearance.

Before: ROGERS and GARLAND, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

ROGERS, Circuit Judge:

Consolidation Coal Company petitions the court for review of a decision of the Mine Safety and Health Review Commission upholding a citation by the Mine Safety and Health Administration (MSHA) for failure to ensure that any of its miners could at all times see a warning signal mounted on a methane monitor in one of its mines, in contravention of 30 C.F.R. § 75.342(b)(2). Consolidation concedes that its miners could not see the warning signal at all times, but contends that because its mine automatically shut down whenever the methane levels reached the point where the warning signal was to be triggered, it was in compliance with the regulation. Mindful of the substantial deference we owe the Secretary in the interpretation of her own regulations, we deny the petition for review.

**I.**

In the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. §§ 801 et seq. (1988), Congress directed the Secretary of Labor to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal ... mines." 30 U.S.C. § 811(a) (1988). Concerned about the accumulation of methane gas and ignition sources that could spark explosions, Congress directed the Secretary to require that mine operators install monitors "for detecting concentrations of meth-

ane" on "any electric face cutting equipment," including "longwall face equipment." 30 U.S.C. § 863(*l*). Pursuant to this congressional delegation, the Secretary of Labor has promulgated regulations requiring the installation of methane monitors on, *inter alia*, "all ... longwall face equipment." 30 C.F.R. § 75.342(a)(1) (1997). The Secretary requires each of the methane monitors to include a warning signal. In 1994, the regulations provided:

(1) When the methane concentration at any methane monitor reaches 1.0 percent the monitor shall give a warning signal.

(2) The warning signal device of the methane monitor shall be visible to a person who can deenergize the equipment on which the monitor is mounted.

30 C.F.R. § 75.342(b) (1994).[1] The Secretary at that time also required all longwall machinery to shut down when the methane concentration in the mine reached 2.0%. 30 C.F.R. § 75.342(c) (1994).[2]

Consolidation uses the longwall mining system to extract coal from its Robinson Run No. 95 mine in West Virginia. A longwall is created by digging two parallel, vertical tunnels and a third horizontal connector tunnel. *See International Union, United Mine Workers v. FMSHA,* 931 F.2d 908, 910 (D.C.Cir.1991). The horizontal connector is the longwall; its ceiling "exposes the face of rock from which coal will be extracted by a shearer moving back and forth across the face." *United Mine Workers v. Dole,* 870 F.2d 662, 675 (D.C.Cir.1989). The shearing process not only cuts coal, but releases methane contained in the coal seams. Methane is an odorless, colorless, tasteless, and highly explosive gas that emanates naturally from the seams. S.Rep. No. 95–181, at 41 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3441.

Longwall face 2–D in Consolidation's West Virginia mine contains two methane sensors, placed at the middle and one end (the "tailgate") of the longwall. These sensors are

---

**1.** The regulations do not differ in any relevant way today. *See* 30 C.F.R. § 75.342(b) (1997).

**2.** In 1994, 30 C.F.R. § 75.342(c) provided:

The methane monitor shall automatically deenergize the machine on which it is mounted when—

(1) The methane concentration at any methane monitor reaches 2.0 percent; or

(2) The monitor is not operating properly.

connected to a methane monitor located at the other end of the longwall (the "headgate"). The monitor contains a panel with a yellow warning light that flashes when methane reaches a level of 1.0% of the atmosphere as well as a red "trip light" that will activate at the same time. It also contains two digital displays that provide readouts of the methane levels along the longwall face. Whenever the warning lights are triggered, the lighting on petitioner's longwall face goes out and all the equipment electrically connected to the longwall automatically deenergizes, with the exception of the methane monitors and face telephone system.[3] In this way, Consolidation's mine automatically shuts down before federal regulations require it to do so, at 1.0% methane, rather than at 2.0% methane. *See* 30 C.F.R. § 75.342(c)(1) (1997).

After promulgating section 75.342(b), MSHA inspectors notified Consolidation seven times that its mine did not comply with the regulation. In 1993, MSHA sent two letters to Consolidation discussing the regulation's visibility requirements. The company took no action in response to the letters and warnings. On April 19, 1994, a MSHA inspector visited Consolidation's West Virginia mine. The inspector could not see the warning lights on the system's methane monitor from the position of the "headgate operator," who was the miner closest to the monitor. The monitor was located approximately thirty feet from the place where the headgate operator would shovel spilled coal onto the conveyor belt that took the coal to the surface. Accordingly, the MSHA inspector issued a citation for failure to comply with section 75.342(b)(2).

Consolidation contested the citation, and an Administrative Law Judge vacated it. Although there was no doubt that the headgate operator could not see the warning lights of the methane monitor at all times, the judge concluded that the deenergization of the longwall mining equipment and nearby lighting when the methane level reached 1.0% constituted a "visible signal to the headgate operator and other miners authorized to deenergize the longwall ... that methane

may have reached 1.0%," as required by section 75.342(b)(2). *Consolidation Coal Co. v. Secretary of Labor,* 16 FMSHRC 1241, 1246 (1994). The automatic shut down met this warning function because

> the headgate operator [then] must return to the master control box to restart the power. When the operator arrives at the control box after a methane shutdown, he will be confronted by computer [sic] display that will advise him in plain english [sic] that there has been a "methane monitor fault."

*Id.* at 1243–44 (citations omitted).

The Secretary appealed to the Commission, arguing that the "evidence was undisputed that the warning signal device on the methane monitor was not visible to a person who could deenergize the longwall," and that that fact was determinative of noncompliance with section 75.342(b)(2). *Consolidation Coal Co. v. Secretary of Labor,* 18 FMSHRC 1903, 1906 (1996). By a 2–1 vote, the Commission accepted the Secretary's interpretation of the regulation and reinstated the citation. *Id.* at 1906. Regarding Consolidation's automatic deenergization at 1.0% methane, the Commission observed that "[t]he Secretary's regulatory scheme requires human intervention when methane levels reach 1 percent and automatic deenergization of equipment at 2 percent methane. Consol[idation] has, in effect, eliminated the requirement for human intervention" in contravention of section 75.342(b)(2). *Id.*

## II.

▮ Whether Consolidation's methane monitoring system complies with section 75.342(b)(2) turns on the Secretary's analysis of the regulation that was accepted by the Commission. "We accord great deference to interpretations ... advanced by the Secretary and accepted by the Commission." *Energy West Mining Co. v. FMSHRC,* 40 F.3d 457, 462 (D.C.Cir.1994). The court "must defer" to their interpretations "unless an 'alternative reading is compelled by the regulation's plain language or by other indications

---

**3.** According to the parties' briefs, to a person standing where the headgate operator was, auto-matic deenergization appears virtually identical to a power outage.

of the Secretary's intent at the time of the regulation's promulgation.' " *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 2386–87, 129 L.Ed.2d 405 (1994) (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314–15, 99 L.Ed.2d 515 (1988)). Likewise, if the administrative interpretation of the regulation is "clearly erroneous," the court must reject it. *See, e.g., Jim Walter Resources, Inc. v. Secretary of Labor,* 103 F.3d 1020, 1024 (D.C.Cir.1997).

Contrary to Consolidation's contention, we conclude, first, that the Secretary's interpretation of section 75.342(b) does not conflict with its plain meaning. Under the Secretary's interpretation, the monitor warning signal at all times must be visible to a miner who could respond if the light is triggered by a concentration of 1.0% methane on the longwall face. The interpretation requires not just a warning signal, but a signal that is a "device of" the methane monitor and a signal that is visible at all times to a miner who can react to increasing methane levels and, if necessary, deenergize the mining equipment. Through this interpretation, the Secretary has appropriately construed section 75.342(b) to give effect to all of its provisions. *Cf. Otis Elevator Co. v. Secretary of Labor,* 921 F.2d 1285, 1289 (D.C.Cir.1990). It is an interpretation that requires a visible signal that would be triggered whenever methane levels exceed 1.0%, regardless of what other safety measures may be activated by the rise in methane. Consolidation does not have such a signal in its West Virginia mine. Its methane warning device *is* the longwall equipment. Thus, if Consolidation's equipment fails to deenergize when methane reached 1.0%, its miners might never know, because the methane monitor warning lights are not always visible to the headgate operator.

Consolidation contends that its methane monitoring device could also comport with section 75.342(b)(2). But this alternate reading is not compelled by the regulation. *See Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. at 2386–87. Consolidation's attempt to construe the deenergization of all of its mining machinery as "the warning signal device of the methane monitor" is implausible. Although such a large-scale response might effectively warn the miners that something is wrong, be it a power outage or an increased concentration of methane in the mine, the longwall machinery can hardly be characterized as a "device of" the monitor. The machinery operates to extract coal, rather than to measure methane levels. It does not in some way belong to the methane monitor, although such belonging is what the term "of" suggests the regulation means.[4] Nor does the machinery serve the purposes of the monitor, at least not exclusively, although that is often the function filled by a "device." [5] Consolidation's approach thus did not clearly comply with section 75.342(b), as it urges.

Nor did the Secretary intend to cover methane monitoring devices like the one located in Consolidation's mine when she promulgated section 75.342(b)(2). *See Gardebring,* 485 U.S. at 430, 108 S.Ct. at 1314–15. As the Secretary explained in the Federal Register upon promulgating section 75.342(b)(2),

> paragraph (b)(2) requires the warning signal device of the methane monitor to be visible to a person capable of deenergizing the equipment on which the monitor is mounted. This allows the operator of the face equipment, or other person, to deenergize the equipment at 1.0 percent, if necessary.

57 Fed.Reg. 20,868, 20,891 (May 15, 1992). The Secretary's explanation does not suggest any expansive intent to cover visible warning

---

4. The word "of" is "used as a function word to indicate the material, parts, or elements composing something or the contents held by something." *Webster's Third New International Dictionary Unabridged* 1565 (1981). The longwall machinery is not an element of the methane monitor.

5. The term "device" means "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." *Webster's Third New International Dictionary Unabridged* 618 (1981). The longwall machinery in this sense is not a device meant to warn the headgate operator that methane levels have reached 1.0%. Its special purpose or function is not to issue methane level warnings. The machinery instead mines coal, and was installed along the longwall for that purpose.

signals not covered by the plain language of the regulation. Consolidation offers no evidence that the Secretary has ever adopted a different interpretation of the regulation, or that she has contradicted her position on appeal. *See National Wildlife Fed'n v. Browner,* 127 F.3d 1126, 1130 (D.C.Cir.1997). Hence, there are no "other indications of the Secretary's intent at the time of the regulation's promulgation" to suggest that the interpretation taken by the Secretary here marks a departure from her stated prior understanding in enacting the regulation. *See Thomas Jefferson Univ.,* 512 U.S. at 512, 114 S.Ct. at 2386–87.

Consolidation, and the dissenting commissioner, *see Consolidation Coal Co.,* 18 FMSHRC at 1908–10 (Jordan, Chair, dissenting), suggest that the Secretary's construction is inconsistent with the Mine Act's purpose of increasing miner safety, and therefore is unreasonable. *See United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *Energy West Mining Co.,* 40 F.3d at 462; *San Luis Obispo Mothers for Peace v. NRC,* 789 F.2d 26, 36 (1986). Yet neither Consolidation nor the dissent suggest that there can never be a need for a fail safe mechanism. By interpreting the regulation to require a visible warning signal, the Secretary has assured the existence of a check on rising methane levels in addition to the check provided by the automatic shutdown process. If the equipment fails for some reason to shut down at 1.0% methane, the Secretary's interpretation ensures that the headgate operator will still be warned, after which he can make adjustments to reduce methane levels, thereby avoiding a potentially hazardous situation. This fail-safe, is, presumably, in the operator's as well as the miners' interest. While there may be contrary arguments based on technological advances or the desirability of reducing labor costs, the Secretary's interpretation gives weight to other benefits and in so doing her interpretation cannot be deemed clearly erroneous. *See Jim Walter Resources, Inc.,* 103 F.3d at 1024.

Early deenergization of the longwall upon the detection of 1.0% methane may well have its own safety advantages. As the Tenth Circuit has explained, "[a]utomatic deenergization prevents the electrical equipment from sparking, which could ignite the gas and result in an explosion." *Ayala v. United States,* 49 F.3d 607, 609 (10th Cir.1995). If so, then early deenergization may be even safer than later deenergization. It may be so safe that the human fail-safe required by the Secretary's interpretation of the regulation proves to be unnecessary. Yet a contest hearing before an administrative law judge or appeal to this court are not the places to evaluate alternatives to regulatory requirements. On appeal, the Secretary's "plausible and sensible reading of [her] own regulation would prevail even if the company had presented an equally plausible alternative construction." *Cold Spring Granite Co. v. FMSHRC,* 98 F.3d 1376, 1378 (D.C.Cir. 1996). Consolidation had an option to ensure that its safety innovation complied with the Secretary's regulatory scheme by petitioning the Secretary for modification of the safety standard, but did not pursue it.[6] The court has previously recognized that the modification process usefully involves the Secretary, who writes the regulations and to whom the court must defer in interpreting them, in the process of tailoring regulations to fit the particular requirements of mine operators. *See Otis Elevator Co.,* 921 F.2d at 1293. The needs of mine operators such as Consolidation can be met through this normal regulatory process without stifling technological innovation, much less circumventing the enforcement scheme that Congress has authorized the Secretary to establish to carry out the safety mandates of the Mine Act.

Accordingly, we deny the petition for review.

---

6. The Mine Act provides:
    Upon petition by the operator ... the Secretary may modify the application of any mandatory safety standard to a coal or other mine if the Secretary determines that an alternative method of achieving the result of such standard exists which will at all times guarantee no less than the same measure of protection afforded the miners of such mine by such standard....
    30 U.S.C. § 811(c).